[Civ. No. 6529. Second Appellate District, Division Two.—March 24, 1931.]

LOUISE B. CARR, Respondent, v. BANK OF ITALY (a Corporation), Appellant.

Haas & Dunnigan, Walter F. Haas and H. C. Johnston for Appellant.

William P. Mealey for Respondent.

ARCHBALD, J., *pro tem.* — Plaintiff and one Rockhill were the owners of a certain motion picture theater in Los Angeles, together with the furniture, pictures, etc., used in connection therewith. Plaintiff was the owner of a promissory note in the sum of $10,000 secured by a chattel mortgage on all of the personal property in the theater. On July 20, 1926, plaintiff and Rockhill sold to one George Landers and his associate the theater and personal property for an agreed price, $8,000 of which was to be paid in cash and credited on the chattel mortgage. Landers and his associate Oscar Oberndorff, together with Rockhill, went to the Pico Heights branch of the defendant bank for the purpose of opening an escrow. At that time the chattel mort-

gage was in the east in the possession of a relative of plaintiff, being held as security for money advanced, and Rockhill was not able to give a good description of it. The escrow clerk thereupon told the parties that in his opinion the matter could not be handled through escrow. Oberndorff then said that they had "to get this money in the bank some way", to which the clerk replied that he could make a suggestion. The parties then told him that he should know his business and that whatever he suggested would be all right with them. The result was that the escrow clerk drew up an instruction which was handed to Mr. Landers with the suggestion that he pass it on to Rockhill, the clerk saying to Landers that if it met with his, Landers', approval, and he would sign it, a cashier's check in the amount named would be obtained for him and held in accordance with the instruction. The instruction was then signed by Landers who gave the clerk his check for $8,000, and a cashier's check was then drawn for such amount in favor of Landers. The instruction read as follows:

"Bank of Italy,
　　"Pico Heights Branch,
　　　　"Los Angeles, California.

"I the undersigned hand you herewith Cashier's check No. 334035 for $8000.00. You are to hold this check until you receive a certain chattel mortgage upon which you will indorse a payment of $8000.00. This check is not to be delivered until you receive written instructions from the undersigned.

"GEORGE H. LANDERS."

Both the check and the signed instruction were then left with the bank. The evidence is conflicting as to whether or not the cashier's check was indorsed by Landers then or later when it was canceled. On August 14, 1926, Landers and Mr. Carr, the husband and agent of plaintiff, went to the bank and the $8,000 check was canceled and the sum of $584 was paid to Mr. Carr, Landers' receipt therefor being taken by the bank, and another cashier's check in Landers' favor was written for the balance, $7,416, at which time the number of the first cashier's check and the amount thereof were erased from the instruction and the number of the

second check, 334209, and the amount, $7,416, were written therein in their place.

The chattel mortgage at this time had not arrived. Thereafter, and before it did arrive, the defendant bank was restrained in a certain action pending in the superior court, in which Landers and Oberndorff were defendants, from honoring any checks, drafts or orders of Landers or Oberndorff or from paying out any moneys on drafts, orders or checks held by said bank for the account of either of said parties, on the theory that the money deposited in the defendant bank and which went to make up the cashier's check so deposited, to the amount of $4,000, at least, belonged to the plaintiff in said action. After such order was made, by stipulation of the parties to that action $4,500 was taken out of the cashier's check for $7,416 and deposited with the bank in the name of Oberndorff, to be held by the bank pending a determination of said action, leaving a balance of $2,916 in the form of a cashier's check in favor of Landers, which, on August 20, 1926, was deposited with defendant bank under an instruction similar to the first one given. On August 21st, it having then arrived, Landers inspected the chattel mortgage, and the cashier's check for the balance of $2,916, indorsed by Landers, was given to Mr. Carr. There is testimony to the effect that the officer of the bank was told that possession of the theater was to be immediately given to the purchasers. The $4,500 was eventually ordered paid on the judgment rendered for the plaintiff in the action in which the restraining order was issued. This suit was brought by plaintiff against the bank for the $4,500, on the theory that the bank accepted the check for $8,000 and agreed to hold the same for plaintiff pending the production of the chattel mortgage and that it failed so to do. From a judgment in favor of plaintiff the defendant appeals.

It is appellant's contention that the check in question remained at all times subject to the disposition of Landers and that it was error for the trial court to permit the introduction of evidence which varied the terms of the written instruction accompanying its deposit. Respondent urges that when the deposit of the check was accepted by the bank it became a trustee for the benefit of respondent

and that the evidence was properly admitted to show the real intention of the parties.

Both parties admit that there was no escrow, and there could hardly be a contention that there was in view of the testimony on the subject. The parties wanted to form one, but the bank refused to make an escrow. Nor does respondent contend that the writing itself creates the trust alleged in the complaint. That is evident from the fact that respondent sought to introduce evidence extrinsic to it to show the intent of the parties. The real contention is that the acceptance of the draft, knowing that it was to be a part of the purchase price of the theater and knowing that possession was to be given immediately to the purchasers, implies a trust that the bank would not permit the draft to be used for any other purpose. The parties had no intention of making a deposit of the money in trust when they went into the bank. They intended to form an escrow. The bank refused it and the escrow clerk made a suggestion of a way that the money could be handled, which was adopted. A draft was purchased for the amount by Landers, not in the name of respondent, but in his own name, and that was deposited with the bank, not as the property of the bank but as Landers' property. The instructions were not that it was to be delivered to respondent when the bank was satisfied that the amount of the chattel mortgage and the rate of payments were as understood by Landers at the time, but that it was *not to be delivered* "until you receive written instructions". The name of respondent does not appear in the instruction. The chattel mortgage upon which the bank is to "endorse a payment of $8000.00" is not described. The instruction is Landers'. The check is his, whether it was indorsed by him at the time of deposit or at the time of cancellation. When it was canceled and a small payment made to respondent or her agent the new check was made in Landers' name and a receipt for the payment taken from Landers and not from Carr. At no time, apparently, was the chattel mortgage or note actually received by the bank. So it was clearly not the intention of the escrow clerk when he suggested the arrangement to make the bank a trustee of the check for the benefit of respondent or to do anything more than make it the depository of the check and Landers' agent to deliver it to whom

and when instructed so to do by its owner, Landers. There was no relation of personal confidence or trust toward respondent assumed by the bank that we can see, and its rejection of the parties' offer to form an escrow, because of the fact that they could not give the escrow clerk a more definite description of the chattel mortgage and note, negatives any intention of assuming an even greater responsibility, or of any intention on the part of Landers and respondent to have the bank do so.

The case of *Sayer* v. *Wynkoop*, 248 N. Y. 54 [161 N. E. 417, 418], speaking of cases where a third party received money for one with whom it was deposited by the owner, says: "In all these cases . . . there appears to have been an express promise on the part of the person receiving the moneys to pay them over or an acknowledgment by him that the moneys were received to be held in trust for such third person. However, it is apparent that the intention of the owner, and not that of the receiver, is controlling upon the question whether the title to the money has been transferred and a trust has been created. True, there must be an assumption of the trust duty by the receiver, but that may arise through implication as well as through expression." Here everything that was done repels the thought that either Landers or the bank or respondent had any intention of creating a trust.

The Supreme Court in the case of *Noble* v. *Learned*, 153 Cal. 245 [94 Pac. 1047, 1049], says: "The contention appears to be that Noble was constituted a trustee of the shares or certificates for the benefit of Mrs. Lee during her lifetime, and of the parties named in the various endorsements after her death. By the creation of an express voluntary trust for the benefit of third persons the title or estate in the property, which is the subject of the trust, so far as may be necessary for carrying out the purposes of the trust, is vested in the trustee. This is implied in the very nature of the term 'trust'. (28 Am. & Eng. Ency. of Law, 2d ed., 858; Civ. Code, secs. 863, 2250.) It is plain, however, that the transaction above recited did not operate to convey to Noble any title whatever to the 40 shares or to the certificate. The written assignment of the shares, if operative at all, could be effective only to transfer title to the assignee, Mrs. Learned. It follows that the transaction

cannot be given the effect claimed, i. e., of making Noble a trustee.'' Assuming, without deciding, that parol evidence was properly admitted in the instant case, the only conflict in it appears to be whether or not the various checks deposited were indorsed by Landers at the time of deposit or at the time of cancellation. But regardless of when they were indorsed, the only conclusion to be drawn from the evidence is that the bank was to hold each check until it was authorized by Landers to deliver it. No title thereto was given the bank and no right to do anything with it except upon Landers' direction; and we fail to see how any trust could arise where no trust is imposed. In that respect there is a similarity between the Noble case and the one now before us.

''A person holding property, real or personal and intending to make a voluntary disposition thereof for the benefit of another, may do so in either one of three modes: 1. He may make a simple conveyance or assignment of it directly to the donee, so as to vest in the latter whatever interest and title the donor has, without the intervention of any trust. 2. He may make a transfer of it to a third person upon trusts declared in favor of the donee. 3. He may retain the title and declare himself a trustee for the donee, and thus clothe the donee with the beneficial estate. By either of these modes, if the transaction is imperfect and executory, equity will not aid to enforce it; and if the intention of the party is to adopt one of the methods, a court of equity will not resort to either of the other methods for the purpose of carrying it into effect. . . . If the donor adopts the second or third, he need not use any technical words, or language in express terms creating or declaring a trust, but he must employ language which shows unequivocally an intention on his part to create a trust in a third person, or to declare a trust in himself.'' (Pomeroy's Equity Jurisprudence, 4th ed., sec. 997.) The language used here does not show such necessary unequivocal intention to create a trust, in our opinion. There is no question but that the parties would, under the advice of a lawyer, have made a deposit of the check under circumstances that would have placed it beyond the power of a creditor of Landers, or anyone claiming a part of the fund as their own, to reach, but we cannot assume that the parties were expecting

the bank to practice law or to do anything more than make a suggestion of plans which they themselves in their own discretion might adopt; and having adopted a plan so suggested, which was imperfect in its operation, equity cannot convert it into a perfect one by "imputing a trust where a trust was not in contemplation". (*Trubey* v. *Pease,* 240 Ill. 513 [16 Ann. Cas. 370, 88 N. E. 1005, 1008].)

As we view the evidence, and assuming, without deciding, that it was properly admitted, the only conclusion that could be drawn therefrom is that no trust relationship existed; that the cashier's check belonged at all times to Landers and could not be held by the bank against the order and judgment of the court which diminished it by the sum of $4,500, and that in consequence there is no liability on the part of the bank to respondent. We might also add that it appears from the evidence that the contract with Landers and Oberndorff for the purchase of the theater, together with the $3,500 paid by them, was declared forfeited and the theater was sold to other parties subject, so far as plaintiff's share is concerned, to the unpaid balance of her chattel mortgage; so plaintiff would not seem to be in any worse financial condition than she was before.

Judgment reversed.

Works, P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 23, 1931, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 21, 1931.